1   David Boies, Esq.
    **BOIES, SCHILLER & FLEXNER LLP**
2   333 Main Street
    Armonk, N.Y. 10504
3   Telephone: (914) 749-8200
    Facsimile: (914) 749-8300
4   Email dboies@bsfllp.com
    (*pro hac vice* pending)
5
    Jonathan D. Schiller, Esq.
6   Duane L. Loft, Esq.
    **BOIES, SCHILLER & FLEXNER LLP**
7   575 Lexington Avenue
    New York, NY 10022
8   Telephone:  (212) 446-2300
    Facsimile: (212) 446-2350
9   Email jschiller@bsfllp.com
    Email: dloft@bsfllp.com
10  (*pro hac vice* pending)

11  John F. Cove, Jr., SBN 212213
    **BOIES, SCHILLER & FLEXNER LLP**
12  1999 Harrison Street; Suite 900
    Oakland, CA 94612
13  Telephone: (510) 874-1000
    Facsimile: (510) 874-1460
14  Email: jcove@bsfllp.com

15  Jeffrey L. Kessler
    David G. Feher
16  David L. Greenspan
    **DEWEY & LEBOEUF LLP**
17  1301 Avenue of the Americas
    New York, NY 10019
18  Telephone:  (212) 259-8050

19  Counsel for Plaintiffs

20                  **UNITED STATES DISTRICT COURT**        A D R

21              **NORTHERN DISTRICT OF CALIFORNIA**

22                     **OAKLAND DIVISION**
                                              **C11-05525**
23  - - - - - - - - - - - - - - - - - - - - - - x

24  Carmelo Anthony, Chauncey Billups, Kevin
    Durant, Kawhi Leonard, Leon Powe, and all      :
25  those similarly situated,                           **COMPLAINT**
                                                   :
26                          Plaintiffs,                **CLASS ACTION**
                                                   :
27              - against -                            **JURY TRIAL DEMANDED**
                                                   :
28  NATIONAL BASKETBALL
                                              1
_____

ASSOCIATION, ATLANTA HAWKS, LP, :
BANNER SEVENTEEN LLC, BOBCATS
BASKETBALL, LLC, CHICAGO       :
PROFESSIONAL SPORTS LIMITED
PARTNERSHIP, CAVALIERS OPERATING :
COMPANY, LLC, DALLAS BASKETBALL
LIMITED, THE DENVER NUGGETS     :
LIMITED PARTNERSHIP, DETROIT
PISTONS BASKETBALL COMPANY,      :
GOLDEN STATE WARRIORS, LLC,
ROCKET BALL, LTD., PACERS
BASKETBALL LLC, LAC BASKETBALL   :
CLUB, INC., THE LOS ANGELES LAKERS,
INC., HOOPS, L.P., MIAMI HEAT LIMITED :
PARTNERSHIP, MILWAUKEE BUCKS,
INC., MINNESOTA TIMBERWOLVES    :
BASKETBALL LIMITED PARTNERSHIP,
NEW JERSEY BASKETBALL, LLC, NEW  :
ORLEANS HORNETS NBA LIMITED
PARTNERSHIP, MADISON SQUARE
GARDEN, L.P., THE PROFESSIONAL   :
BASKETBALL CLUB, LLC, ORLANDO
MAGIC, LTD., PHILADELPHIA 76ERS  :
L.P., SUNS LEGACY PARTNERS, L.L.C.,
TRAIL BLAZERS, INC., SACRAMENTO  :
KINGS LIMITED PARTNERSHIP, LP, SAN
ANTONIO SPURS, L.L.C., MAPLE LEAF :
SPORTS & ENTERTAINMENT LTD., JAZZ
BASKETBALL INVESTORS, INC., and  :
WASHINGTON BULLETS, L.P.,
                                 :

                Defendants.
                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs allege for their Complaint, upon knowledge as to their own acts and status and as to actions occurring in their presence, and upon information and belief as to all other matters:

## NATURE OF THIS ACTION

1.      Plaintiffs are major league professional basketball players and basketball players qualified to be major league professional basketball players.  Defendants are independently owned and operated major league professional basketball teams and their association, the National Basketball Association ("NBA" or the "League").

2

2.     On November 14, 2011, certain Plaintiffs (the "Under-Contract Subclass" players as described in Paragraph 19 below) were employed by individual defendants pursuant to individually negotiated contracts.  The remaining plaintiffs are basketball players who are qualified for and who would receive such contracts in the absence of Defendants' illegal agreement and conspiracy.

3.     In June 2007, more than four years prior to the expiration of the 2005 CBA, NBA league officials warned NBA players and their then-collective bargaining representative, the National Basketball Players Association ("NBPA"), that Defendants intended to substantially reduce the players' share of Basketball Related Income ("BRI"), to impose more restrictive "salary cap" limits affecting players' individual salaries, and to remove or restrict a number of important "system" provisions that protect player rights.

4.     The NBA and the NBPA began negotiations concerning a possible 2011 CBA in 2009. In those negotiations, the NBA and its team owners refused to negotiate their 2007 demands in any meaningful way. On July 1, 2011, immediately upon the expiration of the 2005 CBA, and while negotiations concerning a new CBA were continuing, the Defendants unilaterally imposed a lockout.

5.     Despite the lockout, the NBPA attempted to continue to negotiate a new CBA. Although the NBPA made concession after concession, including concessions that would cost its members more than one billion dollars over a six-year period, the NBA essentially refused to negotiate its basic 2007 demands. Instead the NBA continued to make punitive demands upon the players, continued the lockout, and began canceling preseason and regular season games. In fact, essentially the only movement by the NBA was to demand and then modify the requested concessions from the players *in addition* to the concessions demanded in 2007. Throughout this time, the NBPA kept making additional concessions in search of a reasonable way to reach a new CBA.

6.     On November 6, 2011, NBA Commissioner David Stern wrote the players that they had three days to accept the NBA's proposal or otherwise face increasingly punitive proposals. (Mr. Stern's letter, dated November 6, 2011, is attached as Exhibit A to this

3

1   Complaint.)  This ultimatum further confirmed what League officials had effectively told

2   NBPA representatives—that the NBA had no intention of continuing to negotiate any material

3   changes in the terms of its onerous proposal, that Defendants had effectively abandoned

4   collective bargaining, and declared that further bargaining by the players to materially change

5   the proposal was at an end.

6         7.     Despite the NBA's position, the NBPA tried yet again to negotiate.  During a

7   marathon set of discussions over November 9 and 10, 2011, the players made yet another effort

8   to salvage the collective bargaining process, agreeing to entertain a reduction in player salaries

9   to 50% of League revenues (from 57% in the expired CBA), if the NBA would modify certain

10   of its demands for severe "system" changes that would destroy competition for players.  The

11   League, however, again declined to negotiate its position and then shut down the bargaining

12   process. It made one last "final" revised offer, which did not address the players' concerns, and

13   issued a final ultimatum that if the players failed to accept the League's last and final offer by

14   Tuesday, November 15, the League would impose even more punitive terms which would be

15   non-negotiable. For all intents and purposes, the League declared that it would not further

16   negotiate any changes in these proposals to favor the union. Bargaining was at an end.

17         8.     In the face of the League's effective refusal to negotiate, the League's

18   ultimatum, and the League's effective destruction of the collective bargaining process, the

19   NBPA concluded that further collective bargaining was futile and it disclaimed its role as the

20   players' collective bargaining representative, pursuant to a unanimous vote of the Board of

21   Player Representatives on November 14. That disclaimer was effective on noon Eastern Time

22   on that date.

23         9.     The NBPA and its members had never previously disclaimed the NBPA's

24   representational status or decertified their union, rejecting calls from many members to do so in

25   connection with the negotiation of two prior CBAs.  The NBPA and its members did

26   everything they could to avoid disclaiming this year, including bargaining for more than two

27   years, making numerous concessions, continuing to bargain and make concessions even in the

28   face of Defendants' lockout, and trying to continue to bargain until Defendants intransigence

4

and ultimatums made clear that further attempts at collective bargaining were futile. In fact, the NBPA continued to make concessions and tried to reach a collective bargaining agreement despite calls from an increasing number of players, who believed the concessions already offered by the NBPA were excessive, to decertify. Ultimately, the owners' demonstrated unwillingness to engage in further bargaining over its ultimatum made clear that continued attempts at collective bargaining were not practical. Accordingly, for the first time in its history, the NBPA and its members disclaimed any collective bargaining role or activity and the NBPA is now a trade association without any authority or role as a collective bargaining representative.

10. Despite this disclaimer, and the complete end of the collective bargaining process, Defendants have jointly agreed and conspired to boycott the players even after their disclaimer in an effort to coerce Plaintiffs and all NBA players to agree to a new onerous system of anticompetitive player restraints and a massive reduction in compensation. Defendants also agreed and conspired to fix the prices, terms, and conditions of future player contracts. The express purpose of Defendants' group boycott and price fixing is to reduce the salaries, terms, benefits, and conditions of employment available in the market for players.

## JURISDICTION AND VENUE

11. These claims arise and are brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, as well as state contract and tort laws.

12. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and 1367.

13. Venue in this action is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22. Each of the Defendants can be found, resides, has an agent, or transacts business in the Northern District of California, and the unlawful activities were or will be carried on in part by one or more of the Defendants within this district.

14. Assignment to the Oakland Division is proper because, as mentioned above, each of the Defendants can be found, resides, has an agent, or transacts business in the Oakland

Division, and the unlawful activities were or will be carried on in part by one or more of the Defendants within this Division.

## THE PARTIES

15.     Plaintiff Carmelo Anthony is a professional basketball player who, from 2003 to 2011, was employed in interstate commerce by the Denver Nuggets.  On February 22, 2011, he was traded to the New York Knicks and signed a three-year contract extension. His contract with the New York Knicks extends from 2011 through the 2014-2015 NBA season and is worth $65,000,000.

16.     Plaintiff Leon Powe is a professional basketball player who was employed in interstate commerce by the Memphis Grizzlies.  He was signed by the Memphis Grizzlies as a free agent on March 5, 2011.  He is a resident of this District and this Division.

17.     Defendants include the 30 NBA member teams, each of which is a separately-owned and independent entity which operates a professional basketball franchise for profit under the team name and in the cities set forth below:

| NBA Team Owner | State of Organization | Team Name (City) |
| --- | --- | --- |
| Atlanta Hawks, LP | Georgia | Atlanta Hawks |
| Banner Seventeen LLC | Delaware | Boston Celtics |
| Bobcats Basketball, LLC | Delaware | Charlotte Bobcats |
| Chicago Professional Sports Limited Partnership | Illinois | Chicago Bulls |
| Cavaliers Operating Company, LLC | Delaware | Cleveland Cavaliers |
| Dallas Basketball Limited | Texas | Dallas Mavericks |
| The Denver Nuggets Limited Partnership | Delaware | Denver Nuggets |
| Detroit Pistons Basketball Company | Michigan | Detroit Pistons |
| Golden State Warriors, LLC | California | Golden State Warriors |
| Rocket Ball, Ltd. | Texas | Houston Rockets |

CLASS ACTION COMPLAINT AND JURY DEMAND

| Pacers Basketball, LLC | Indiana | Indiana Pacers |
|---|---|---|
| LAC Basketball Club, Inc. | California | Los Angeles Clippers |
| The Los Angeles Lakers, Inc. | California | Los Angeles Lakers |
| Hoops, L.P. | Delaware | Memphis Grizzlies |
| Miami Heat Limited Partnership | Florida | Miami Heat |
| Milwaukee Bucks, Inc. | Wisconsin | Milwaukee Bucks |
| Minnesota Timberwolves Basketball Limited Partnership | Minnesota | Minnesota Timberwolves |
| New Jersey Basketball, LLC | New Jersey | New Jersey Nets |
| New Orleans Hornets NBA Limited Partnership | North Carolina | New Orleans Hornets |
| Madison Square Garden, L.P. | Delaware | New York Knicks |
| The Professional Basketball Club, LLC | Oklahoma | Oklahoma City Thunder |
| Orlando Magic, Ltd. | Florida | Orlando Magic |
| Philadelphia 76ers, L.P. | Delaware | Philadelphia Sixers |
| Suns Legacy Partners, L.L.C. | Delaware | Phoenix Suns |
| Trail Blazers, Inc. | Oregon | Portland Trail Blazers |
| Sacramento Kings Limited Partnership, L.P. | California | Sacramento Kings |
| San Antonio Spurs L.L.C. | Texas | San Antonio Spurs |
| Maple Leaf Sports & Entertainment Ltd. | N/A | Toronto Raptors |
| Jazz Basketball Investors, Inc. | Utah | Utah Jazz |
| Washington Bullets, L.P. | District of Columbia | Washington Wizards |

18.    Defendant NBA, which maintains its offices at 645 Fifth Avenue, New York, New York, is an unincorporated association consisting of the 30 separately-owned and independently-operated professional basketball teams that are listed in paragraph 18 above.

7

The NBA is engaged in interstate commerce in the business of, among other things, operating the sole major league professional basketball league in the United States.

### CLASS ACTION ALLEGATIONS

19.     Plaintiffs Carmelo Anthony, Chauncey Billups, Kevin Durant, Kawhi Leonard, Leon Powe (collectively "Plaintiffs") are representatives of a class, as defined by Rule 23(b)(1), 23(b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure, and bring this action on behalf of themselves and the class members as described in paragraphs 20-26.

20.     The class represented by Plaintiffs consists of (i) all players who are under contract to play professional basketball for an NBA team at any time from November 14, 2011, to the date of final judgment in this action and the determination of any appeal therefrom (the "Under-Contract Subclass"), (ii) all players who are not under contract with an NBA team and are seeking employment as professional basketball players for an NBA team at any time from November 14, 2011, to the date of final judgment in this action and the determination of any appeal therefrom (the "Free Agent Subclass"); and (iii) all college and other basketball players who have not previously been under contract with any NBA team and, as of November 14, 2011, to the date of final judgment in this action and the determination of any appeal therefrom, are or will be eligible to play basketball as a rookie for an NBA team (the "Rookie Subclass").

21.     The class and each subclass are so numerous and geographically so widely dispersed that joinder of all members is impracticable.  There are questions of law and fact common to the class, including whether (a) Defendants have entered into an agreement and conspiracy to boycott players following the players' disclaimer and/or to cancel NBA games; (b) Defendants' group boycott of NBA players and Defendants' other concerted actions are per se unlawful and/or unreasonable restraints of trade under the antitrust laws; (c) Defendants conduct is protected by the non-statutory exemption from the antitrust laws; (d) Defendants' conduct caused injury to the business and property of Plaintiffs; and (e) Defendants have breached provisions of the Uniform Player Contracts.  Except for provisions as to individual compensation and other variations that do not materially affect the certification of a class, the contracts signed by NBA players are virtually identical throughout the NBA.

8

22.     Plaintiffs' claims are typical of the claims of the class or subclass that they represent, and the Plaintiffs will fairly and adequately protect the interests of the class or subclass that they represent.  Common questions of law and fact predominate within the meaning of Rule 23(b)(3) of the Federal Rules of Civil Procedure.

23.     Each person in the class or subclass is, has been, and/or will be subject to uniform agreements, rules and practices that Defendants have imposed and will impose to restrain competition for player services, including, but not limited to Defendants' group boycott of the players, any cancelation of games, and any and all similar player restraints that Defendants by their agreement and as a result of their conspiracy have imposed and will impose on members of the class or subclass.

24.     The prosecution of separate actions by individual members of the class would create the risk of:

(a)     inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(b)     adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests within the meaning of Rule 23(b)(1) of the Federal Rules of Civil Procedure.

25.     Questions of law and fact are common to the class and each of the subclasses and predominate over any questions affecting only individual class members, including legal and factual issues relating to liability, damages and restitution.  This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitive litigation.  There will be no material difficulty in the management of this action as a class action.

9

## NATURE OF INTERSTATE TRADE AND COMMERCE

26.     The primary business in which Defendants are engaged is the operation of major league professional basketball teams and the sale of tickets and telecast rights to the public for the exhibition of the basketball talents of players such as Plaintiffs.  To conduct this business, Defendants must compete with each other to obtain the professional services of players, such as Plaintiffs, who are signed to contracts to play basketball for the various NBA defendant teams.

27.     The business of major league professional basketball is distinct from other professional sports businesses, as well as from college basketball.  Its distinguishing features include: the rules of the sport and the season during which it is played; the talents of and rates of compensation for the players, for whom playing basketball is their full-time profession; the nature and amounts of trade and commerce involved; and the unique demand for Defendants' games by the consuming public, both as ticket purchasers and as home viewers of and listeners to television and radio.

28.     Defendants' operation of and engagement in the business of major league professional basketball involves a substantial volume of interstate trade and commerce, including the following interstate activities:  travel; communications; purchases and movement of equipment; broadcasts and telecasts of league games; advertisements; promotions; sales of tickets and concession items; sales of merchandise and apparel; employment of players and referees; and negotiations for all of the above.

29.     Defendants' aforesaid interstate transactions involve collective annual expenditures and receipts in excess of $3.8 billion.

30.     The Plaintiffs have been employed by, and/or are seeking employment with, one or more of the defendant teams in interstate commerce as professional basketball players.

## FACTUAL ALLEGATIONS

31.     Defendants jointly enjoy a monopoly in the market for major league professional basketball and a monopoly in the market for the services of major league professional basketball players in the United States.  Defendants comprise the only major professional basketball league in the United States.  Defendants are the only United States

10

market purchasers of the services of major league professional basketball players. The only actual or potential effective competition that exists in this market is among the separately owned and independently operated NBA teams.

32. As detailed below, however, rather than competing for the players' services, Defendants have combined and conspired to eliminate such competition among themselves for NBA players through group boycotts, concerted refusals to deal, and agreements on restricting output and fixing prices. Defendants have accomplished their anticompetitive objective by jointly adopting and imposing a group boycott following the players' disclaimer of collective bargaining and/or by canceling games for the 2012 season. These actions have the purpose and effect of preventing players from offering their services to NBA teams in a competitive market.

**A.    Collective Bargaining in the NBA.**

33. The NBPA and the NBA have been party to a series of collective bargaining agreements ("CBAs") since the 1960s. In the past three decades, the NBPA and the NBA have entered into successive CBAs in 1983, 1988, 1995, 1998 and 2005. The CBAs set forth numerous terms and condition of employment for the NBA players, while at the same time allowing players individually to negotiate certain wage and benefit terms with individual NBA teams.

34. The CBAs included a set of certain core provisions. As embodied in the most recent CBA, one such provision is a revenue-sharing system that provides NBA players with 57% of the Basketball-Related Income ("BRI") that the NBA teams and their owners receive each year.

35. Since 1983, the CBAs also have included a version of a "salary cap" system known as a "soft cap". In general, salary caps place limits on the total salaries that teams can pay players in a given season. The salary cap in the NBA's prior CBAs was termed a "soft" cap because it contained numerous exceptions that, among other things, protected the salaries of middle-tier and important support-role players to ensure there would be a market for their services at fair compensation levels. Exceptions in the most recent CBA included, among

others, (i) a "mid-level" exception, under which teams were allowed to sign players for a total amount equal to 108 percent of the prior season's average NBA salary in excess of the salary cap; (ii) a "bi-annual" exception, which a team could use every other year to sign players for a specified sum of compensation in excess of the salary cap; and (iii) the "Larry Bird" exception, under which teams can exceed the salary cap to resign their own players with expiring contracts, or so-called "Bird free agents".

**B.**   **Four Years Before the 2005 CBA Was Set to Expire, League Officials Threatened to Lock Out Players When it Expired if the Players Refused Their Demands For a Much More Restrictive "Hard" Salary Cap and Drastic Reductions in the Players' Share of BRI.**

36.   In June 2007, two years into the 2005 CBA, NBA Commissioner Stern and his Deputy Commissioner and COO Adam Silver, requested to meet with NBPA representatives. At the meeting that followed, Commissioner Stern informed NBPA Executive Director and lead negotiator Billy Hunter that the owners were determined to modify the 2005 CBA to substantially reduce what was paid to players and the benefits that players received. Commissioner Stern demanded that the players agree to a reduction in the players' BRI percentage from 57% to no more than 50%. Commissioner Stern also insisted on a much more restrictive salary cap, which would severely restrict the market for player services.

37.   At this meeting, Commissioner Stern and Deputy Commissioner Silver told Mr. Hunter that, if the NBPA was unwilling to agree to the NBA's demands, at the end of the CBA the League was "prepared to lock out the players for two years to get everything" that the NBA owners sought and that "the deal would only get worse after the lockout".

**C.**   **After Discussions Began Over a New Agreement, Defendants' Demands Grew Increasingly Unreasonable.**

38.   The two sides did not have another formal bargaining meeting until August 4, 2009, when Commissioner Stern agreed to meet with Mr. Hunter, ostensibly to begin negotiations for a new CBA. However, at that meeting, and at the subsequent 23 bargaining

1    sessions leading up to the eventual lockout on July 1, 2011, NBA league officials adhered to

2    the predetermined basic position that Commissioner Stern had articulated in June 2007.

3        39.     In virtually every bargaining session between August 2009 and June 2011,

4    Commissioner Stern and the NBA repeated the same basic demand:  that the players accept a

5    far more restrictive salary cap and a severe cut in player wages from the 57% of BRI that the

6    players had been guaranteed each year under the 2005 CBA.

7        40.     The discussions revealed that the changes sought to provide owners with a

8    guaranteed profit of at least 10 percent of revenues, regardless of how effectively the owners

9    control costs and manage their teams.  When asked for the basis for this guarantee, Stern

10   replied that "it was a fair rate of return" but offered no additional explanation.  Based on the

11   league's revenue projections, the 10 percent demand would guarantee the owners $600 million

12   in profit, not including increases in team or franchise values.  If the players would not accede to

13   these demands, the league threatened, they would face a career-crippling lockout for a year or

14   more.

15       41.     The owners additionally demanded reductions in the maximum lengths of player

16   contracts, in the level of annual salary increases, and in the players' minimum and maximum

17   salary amounts.  The league also sought to alter protections that had been in place for 40 years

18   allowing players to negotiate guaranteed contract payments in the event that the player's career

19   was shortened by injury, disability or skill level.

20       42.     Consistent with its June 2007 threats, the League threatened in a letter to the

21   NBPA on April 25, 2011, that if the players did not accede to the league's demands prior to a

22   lockout, the Defendants would impose even more punitive terms thereafter.

23

24   **D.     Despite the League's Effective Failure to Negotiate, the Players Continued to Make
          Concessions in an Effort to Reach a Fair Agreement.**

25

26       43.     Although forced in effect to keep bidding against themselves, the players made

27   repeated attempts at compromise despite the League's effective refusal to negotiate its basic

     2007 demands.

28

44.     In June 2011, during the parties' final eight meetings prior to the lockout, the NBPA similarly made numerous financial proposals and concessions.  On the key issue of revenue sharing, the players offered to reduce their share of BRI from 57 to 54.3 percent, which would have provided to the owners $500 million in additional revenues over the next five years.

**E.     Without Moving in Any Meaningful Way Off Their Original Proposal, Defendants Implemented a Joint Lockout of the Players.**

45.     During the June 2011 meetings, despite an improved economy, improved projected financial performance, and increased BRI projections, the league continued to demand basically what it had demanded since June 2007:  a massive reduction in the players' share of BRI. The NBA was also continuing its demands for a much more restrictive salary cap.

46.     At 12:01 a.m., on July 1, 2011, Defendants made good on their threat to impose a concerted lockout of the players.

**F.     To Obtain a Desired Forum in the Event There Might Ever Be A Union Disclaimer and Future Litigation, the Owners Filed a Premature and Unripe Lawsuit for Declaratory Judgment as to the Impact of a Hypothetical Future Disclaimer.**

47.     On August 2, 2011, the NBA and all 30 teams filed a lawsuit in the United States District Court for the Southern District of New York seeking a declaratory judgment that, among other things, its lockout would be legal if there were in the future a disclaimer of collective bargaining representation by the NBA players. *See National Basketball Assoc., et al. v. National Basketball Players Assoc.*, C.A. No. 11-5369-PGG (S.D.N.Y.).  At the time, no threat to disclaim or decertify had been made (although disclaiming or decertifying was obviously recognized as one of many possible options that might, depending on the circumstances, be taken).  In fact, the players were continuing to make concessions at the bargaining table in order to try to achieve a new CBA, and the NBPA was resisting suggestions from certain of its members to consider disclaiming or decertifying at that time.

48.    The lawsuit was entirely designed to secure a particular forum for the NBA and its teams, who otherwise would be the defendants, in the event that the owners' conduct ultimately forced the NBPA to take the unprecedented step of disclaiming.

49.    Subsequent events confirmed that the lawsuit was the NBA owners' attempt at a preemptive strike.  After the lawsuit was filed, the NBPA continued to make numerous concessions in an attempt to achieve a new CBA – concessions that were met not by corresponding concessions from the NBA owners, but instead by ultimatums that the players must accept the Defendants' last offer or suffer even more punitive proposals thereafter.

## G.    The Union Continued to Offer Concessions While Defendants Canceled Games and Failed to Alter Their 2007 Demands in Any Meaningful Way

50.    Following the lockout, Defendants continued to demand a massive reduction of the players' share of revenues, as well as oppressive "system" restrictions that would have the same effect as a more restrictive salary cap.  The NBA players, by contrast, made concession after concession, reducing their revenue-sharing proposals steadily over the course of several months.

51.    At an in-person meeting on or about October 4, 2011, the players offered to reduce their share of revenue to a range of 51%-53% if the owners would make modifications to provide a fair system of competition for NBA players.  The NBA flatly rejected this proposal and continued to press its onerous demands.

52.    The two sides met again for 30 hours of talks over three days, on October 18-20, 2011, with the assistance of a federal mediator.  The League at no point moved from its insistence on not only a massive reduction of player compensation to a -50% split of BRI, but also on its system changes which would severely restrict any competitive market for player services, and destroy the value of the Mid-Level Exception, Bi-Annual Exception and other important player benefits.

53.    On or about November 5, after an almost nine-hour federal mediation session, the NBPA proposed yet another revenue sharing concession, offering to reduce the players'

CLASS ACTION COMPLAINT AND JURY DEMAND

share of BRI to 51% if only the NBA would limit its system changes in a way that would make the deal acceptable to the players. But the NBA would not budge and instead began to take steps to end the bargaining process entirely.

**H.     The NBA Commissioner's Ultimatum, and the Union's Last Ditch Effort to Salvage the Collective-Bargaining Process**

54.     On or about November 6, NBA league commissioner David Stern issued an ultimatum to the players: accept the league's current proposal within three days or otherwise face a "reset" proposal that would cut the players' share to 47% of BRI.

55.     Under the "reset" proposal, which Commissioner Stern outlined in a letter to Mr. Hunter (Exhibit A hereto), the players also would face a hard salary cap; reductions in maximum salaries; stricter limits on contract length; and reductions in the percentages by which salaries could be increased year-to-year.

56.     The League's ultimatum reinforced the NBA's position that Defendants no longer had any intention of negotiating its offer and had effectively announced that it was ending the collective bargaining process as to the critical deal terms.

57.     Nevertheless, in yet one more attempt to reach a deal, the players agreed to an in-person meeting on the afternoon of November 9, 2011. At the meeting, NBPA indicated that the players would entertain a proposed 50-50 split of revenues – in effect giving the owners the exact economic proposal that they had sought back in 2007 – provided that the League agree to modify some of the most onerous aspects of its "system" proposals.

58.     During the approximately twenty-three hours of talks that followed, ending on November 10, 2011, the League did not meaningfully revise its position. The League's "new" and "final" revised proposal continued to provide for the same array of restrictions on player movement and salaries. As the talks concluded, Commissioner Stern re-emphasized the League's ultimatum, making clear that if the players did not accept the NBA's take-it-or-leave-it offer by November 15, 2001, the league would replace it with the even more onerous "reset" proposal consisting of a 47% share of revenues for the players, an even more restrictive salary

1   cap and steep rollbacks on current contracts.  Commissioner Stern also made clear that the

2   League had no intention of negotiating further, announcing publicly that "We have made our

3   revised proposal, and we're not planning to make another one".  In effect, the NBA declared

4   that bargaining over its proposal was over and the only choice of the NBPA was to accept the

5   deal as is, or face a continuing lockout with even more punitive NBA proposals.

6

7   **I.     The Players Are Forced to Renounce and Disclaim All Collective Bargaining
         Representation.**

8           59.     Prior to November 14, 2011, the NBPA (established as a union for the first time

9   in 1954) had never in its history disclaimed its position as the collective bargaining

10  representative for NBA players.  In 1995, a significant number of NBA players, led by Michael

11  Jordan and Patrick Ewing, filed a petition with the NLRB seeking to decertify the NBPA.  The

12  NBPA strenuously opposed the petition and persuaded a majority of players to reject de-

13  unionization.  In addition, in the summer of 1998, the NBA imposed a lockout that resulted in

14  the cancellation of more than one third of the NBA season.  Again, however, the players chose

15  not to exercise their right to disclaim or decertify.

16          60.     The NBA players' actions in this case show a similar caution and reluctance in

17  taking the extreme step of relinquishing their collective-bargaining rights.  They have

18  bargained for years with owners who have threatened them on more than one occasion and

19  whose proposals have not meaningfully improved since the Commissioner threatened a lockout

20  just two years into the 2005 CBA.  They have offered concession after concession amounting to

21  hundreds of millions of dollars in lost salary and benefits.  Their former representatives also

22  continued to bargain notwithstanding growing grass-roots dissatisfaction with the concessions

23  among the players, along with accompanying calls to decertify.

24          61.     Following Commissioner Stern's final ultimatum, his assertion that no further

25  negotiations would be entertained ("We have made our revised proposal, and we're not

26  planning to make another one"), and the threat of increasingly punitive offers, the players and

27  their representatives determined that further collective bargaining was futile.  The process had

28

17

CLASS ACTION COMPLAINT AND JURY DEMAND

collapsed.  Accordingly, the players took steps to terminate the NBPA's status as their collective bargaining representative, effective November 14, 2011.

62.   On November 14, 2011, the NBA players, through their player representatives, voted unanimously to end the collective bargaining status of the NBPA.  The player representatives of the NBPA, who collectively served as its governing body, met and voted to restructure the organization as a professional association instead of a union.

63.   On November 14, 2011, the NBPA notified the NBA and each of the individual NBA teams that, effective immediately, it was disclaiming all interest in acting as the collective bargaining representative of the NBA players, that it no longer intended to represent players in grievances, that it no longer would regulate player agents, and that it intended to file the appropriate forms with the United States Department of Labor and the Internal Revenue Service to terminate the NBPA's status as a union or labor organization and to reclassify for tax purposes as a "business league".

64.   The NBPA amended its bylaws to prohibit its members from engaging in collective bargaining with the NBA, the NBA's member clubs, or their agents.

65.   The NBPA ceased the regulation of player agents and other activities associated with being the collective bargaining representative of NBA players.

66.   The NBPA filed a labor organization termination notice with the Department of Labor.

67.   An application is being filed with the IRS to reclassify the NBPA for tax purposes as a professional association rather than a labor organization

68.   The NBPA withdrew an unfair labor practice charge that it had filed against the League with the National Labor Relations Board.

**J.    Without any Protection from the Non-Statutory Labor Exemption, Defendants Jointly Conspired and Agreed to Boycott the Players.**

69.   Following years of non-negotiable demands by the league, months of a lockout, numerous concessions by the players, repeated ultimatums from the NBA, repeated NBA

CLASS ACTION COMPLAINT AND JURY DEMAND

threats that later offers would be worse, and the players' clear disclaimer of any intent to engage in collective bargaining, the collective bargaining process ended. Accordingly, Defendants' subsequent group boycott of the players and any cancellation of all or part of the remainder of the 82 game season cannot be shielded by any non-statutory labor exemption to the antitrust laws.

70.     As part of continuing their group boycott and any cancellation of games, all of Defendants have conspired and agreed to prevent NBA teams from negotiating, or even communicating with, or employing NBA players, thereby completely eliminating a competitive market for player services. In addition, NBA teams have conspired and agreed not to honor existing contracts with NBA players, by not paying them and precluding their access to team facilities and personnel.

71.     Defendants' express joint purpose of their agreement and conspiracy to achieve massive wage and benefit reductions for NBA players.

72.     Defendants' conduct constitutes an illegal group boycott, concerted refusal to deal, restriction on output and/or restraint of trade in violation of the Sherman Act, under both the per se rule and the rule of reason standard.

73.     This boycott and any cancellation of games prevent NBA players from selling their services in a competitive market as professional basketball players.

**K.     Carmelo Anthony**

74.     Plaintiff Carmelo Anthony, a member of the Under-Contract Subclass, has been a professional basketball player for the New York Knicks since 2011.

75.     On February 22, 2011, Carmelo Anthony signed a contract extension with the New York Knicks that extended through the 2014-2015 NBA season. Under that contract extension, Mr. Anthony is set to earn a salary of over $17 million per year.

76.     As a result of Defendants' ongoing group boycott, any cancelation of games, and other conduct as alleged herein, the Defendants are in breach of, and tortiously interfering with, Mr. Anthony's contract.

19

77.     Defendants' unlawful conduct will prevent Mr. Anthony from playing for any NBA team during the 2011-2012 season and potentially beyond, and will deprive Mr. Anthony of the salary and benefits owed to him for that period.

**L.      Leon Powe**

78.     Plaintiff Leon Powe, a member of the Under-Contract Subclass, signed as a free agent has been a professional basketball player for the Memphis Grizzlies since 2009.

79.     In March 5,2011, Mr. Powe signed with the Memphis Grizzlies.  Mr. Powe is set to earn a base salary of $200,000 per year.

80.     As a result of Defendants' ongoing group boycott, any cancelation of games, and other conduct as alleged herein, the Defendants are in breach of, and tortiously interfering with, Mr. Powe's contract.

81.     Defendants' unlawful conduct will prevent Mr. Powe from playing for any NBA team during the 2011-2012 season and potentially beyond, and will deprive Mr. Powe of the salary and benefits owed to him for that period.

**COUNT I**

**<u>VIOLATION OF SECTION 1 OF THE SHERMAN ACT</u>**

82.     Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 81, as though fully set forth herein.

83.     There is a relevant market for the services of major league professional basketball players in the United States.  Defendants have orchestrated a group boycott of the players who have disclaimed collective bargaining which substantially restrains and injures competition in that market and will continue to do so.

84.     The continuing group boycott operates as a perpetual horizontal group boycott and concerted refusal to deal, which is per se unlawful.  Because the NBA players have disclaimed all union representation and because the collective bargaining process has ended, Defendants' group boycott is not a tool to promote collective bargaining but instead now constitutes an illegal agreement among competitors to eliminate competition for the services of

20

1   major league professional basketball players in the United States and to refuse to pay

2   contractually-owed compensation to players currently under contract with Defendants for the

3   2011-2012 season and beyond, in violation of Section 1 of the Sherman Act.

4       85.    The group boycott and any cancellation of games also constitute an

5   unreasonable restraint of trade under the rule of reason.  Defendants have market power in the

6   relevant market.  Defendants' group boycott and output restriction agreement is a naked

7   restraint of trade without any pro-competitive purpose or effect.  In fact, its stated objective is

8   to reduce player wages and increase the profits of Defendants through the imposition of a

9   concerted refusal to deal.  Moreover, the group boycott agreement and any cancellation of

10  games is not in any way necessary for the production of NBA basketball or the achievement of

11  any pro-competitive objective.

12      86.    Each of Defendants is a participant in this unlawful combination or conspiracy.

13      87.    The Plaintiffs and class members have suffered and will suffer antitrust injury to

14  their business or property by reason of the continuation of this unlawful combination or

15  conspiracy.  Defendants' group boycott of NBA players and any cancellation of games has

16  injured and will continue to injure Plaintiffs and class members by depriving them of the ability

17  to work as, receive contractually mandated compensation for, and/or offer their services as

18  professional basketball players in a free and open market.

19      88.    The conduct of Defendants has caused monetary injuries to Plaintiffs and other

20  class members, also entitling them to damages.

## COUNT II

## BREACH OF CONTRACT

23      89.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1

24  through 88.

25      90.    Plaintiffs and the Under-Contract Subclass include players who, as of November

26  14, 2011, are under contract to play professional basketball for an NBA team in what would

27  have been the 2011-2012 NBA season and thereafter.  Pursuant to Defendants' group boycott,

NBA teams will prevent members of the Under-Contract Subclass from working as
professional basketball players and will refuse to pay them the compensation mandated by their
existing contracts. The aforesaid conduct violates the individual state contract laws, which
apply to these contracts.

91. Plaintiffs and the Under-Contract Subclass members will be damaged by
Defendants breaches of their contracts by a failure to receive amounts that are contractually
owed, and also by being deprived of the opportunity to play professional basketball and further
market their abilities.

92. The conduct of Defendants has caused monetary injuries to Plaintiffs and other
class members, entitling them to damages.

## COUNT III

## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

93. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1
through 92.

94. By jointly conspiring and agreeing to impose a group boycott of NBA players
who have disclaimed union representation, each of Defendants intentionally interfered with the
rights of Plaintiffs Kawhi Leonard and Leon Powe and the Free Agent Subclass and the Rookie
Subclass members to enter into prospective contracts with NBA teams. Absent those
restrictions, these Plaintiffs and subclass members, in reasonable probability, would have
entered into contracts with NBA teams.

95. The aforesaid conduct was taken intentionally by Defendants and is improper as
it is intended to harm the players and earn monopoly profits for Defendants by suppressing the
market for player services in violation of federal law.

96. Plaintiffs Kawhi Leonard and Leon Powe and the Free Agent Subclass and the
Rookie Subclass members will be injured by the deprivation, by reason of the restrictions
imposed by Defendants, of the ability to negotiate and Subclass members will suffer severe and

1  irreparable harm if they are prevented from entering into contracts with NBA teams for the

2  2011-2012 season or beyond.

3  97.    The conduct of Defendants has caused monetary injuries to Plaintiffs and other

4  class members, entitling them to damages.

5  98.    Defendants' conduct violates tort laws in the states in which their tortuous

6  interference with prospective economic advantage is taking place.

**COUNT IV**

**TORTIOUS INTERFERENCE WITH CONTRACT**

9  99.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1

10  through 98.

11  100.    Each of Defendants was aware of the contracts entered into by Plaintiffs

12  Plaintiffs Carmelo Anthony, Chauncey Billups, and Kevin Durant and the members of the

13  Under-Contract Subclass with individual NBA teams.  Defendants then intentionally procured

14  the breaches of those contracts with improper motive and without justification.

15  101.    By jointly conspiring and agreeing to refuse to make contractually-owed

16  payments, each of Defendants intentionally interfered with the rights of those Plaintiffs and

17  class members with NBA Player Contracts for the 2011-2012 NBA season to receive the

18  compensation and other benefits due under those contracts.  Absent these restrictions, the

19  Plaintiffs and Subclass members with NBA Player Contracts for the 2011-2012 season would

20  have received payments mandated by their contracts with NBA teams.  Plaintiffs Carmelo

21  Anthony, Chauncey Billups, and Kevin Durant and Under-Contract Subclass members have

22  suffered injury as a result of Defendants' actions.

23  102.    Plaintiffs and Subclass members with 2011-2012 NBA Player Contracts have

24  suffered significant and irreparable injury as a result of Defendants' tortious interference with

25  contract.  Among other things, these Plaintiffs and Subclass members are being deprived of the

26  ability to practice and compete as NBA players during their very short NBA careers.

27

28

BOIES, SCHILLER & FLEXNER LLP

1   103.   The conduct of Defendants has caused monetary injuries to Plaintiffs and other

2   class members, entitling them to damages.

3   104.   Defendants' tortious interference with contract violates tort laws in the states in

4   which such conduct is taking place.

5   WHEREFORE, Plaintiffs demand judgment in the Plaintiffs' favor against Defendants as

6   follows:

7   a.   Certifying this action as a class action under Rules 23(b)(1), (b)(2) and/or (b)(3)
     of the Federal Rules of Civil Procedure;

8

9   b.   Declaring that Defendants' ongoing group boycott of NBA players and any
     cancellation of games violates Section 1 of the Sherman Act;

10  c.   Declaring that Defendants' imposition of other anticompetitive restrictions
     violate Section 1 of the Sherman Act;

11

12  d.   Awarding Plaintiffs and class members treble the amount of damages they
     sustained as a result of the violations of the antitrust laws alleged herein;

13

14  e.   Awarding Plaintiffs their costs and disbursements in this action, including
     reasonable attorneys' fees; and

15

16  f.   Granting Plaintiffs and class members such other and further relief, including
     any appropriate injunctive relief, as may be appropriate.

17  Dated: November 15, 2011

18

19   BOIES SCHILLER & FLEXNER LLP
     David Boies
     333 Main Street
20   Armonk, NY 10504
     Telephone: (914) 749-8201

21

22   Jonathan D. Schiller
     Duane L. Loft
23   575 Lexington Avenue
     New York, NY 10022
     Telephone: (212) 446-2300

24

25

26   John F. Cove, Jr., SBN 212213
     1999 Harrison Street; Suite 900
27   Oakland, CA 94612
     Tel.   (510)874-1000
     Fax.   (510)874-1460
28   Email  jcove@bsfllp.com

24

BOIES SCHILLER & FLEXNER LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEWEY & LEBOEUF LLP
Jeffrey L. Kessler
David G. Feher
David L. Greenspan
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 259-8050

BOIES, SCHILLER & FLEXNER LLP

CLASS ACTION COMPLAINT AND JURY DEMAND